Court of Appeal, and I would like to begin my discussion this morning discussing the appeals that we filed on behalf of those parties who were dismissed below in connection with their claims about the ripeness of their claims. These parties are the Dollyann Limited Partnership, the Carriage House of Muskegon, Carriage House South, Thetford III with respect to four of its properties, the Deanswood property, the Hardy Street property, Person Court, and Holiday Town, and Thetford IV with respect to the properties of Long Drive and Franklin Court. Your Honor, these cases, these appeals were dismissed on the grounds that they failed to demonstrate that their taking claims were ripe for adjudication. Now, both sides filed motions for summary judgment on the issue of ripeness, so the issue turned on what proof each side submitted in support of its claims or in opposition to the other parties' claims. What standard of review are we to apply to these ripeness determinations? It's denoted. Aren't there underlying questions of facts? Well, there are, and they were examined by the lower court, so for that reason, I think the lower court's analysis needs to be taken into consideration by this court in that process. There was a great deal of briefing by the lower court. The lower court looked at these issues frankly for a couple of years before finally ruling on them. We have questions with the way in which Judge Damage resolved some of these issues. We think that as a legal matter, when we came forward with our proof, we offered what we considered to be admissible evidence, both with respect to the testimony of individual owners, all the owners, who had, in most instances, owned their properties for decades and had operated their properties and knew the markets quite well. In addition, we offered testimony from Mr. Smith, who was an expert, very highly regarded in his field, who had assisted some of these appellants and some of the other plaintiffs in our case in terms of preparing and submitting the various applications under the preservation statute to the... Right, but I guess my point is, and of course the government disputes whether we should have been able to use expert testimony on a rightness issue, but since you did use expert testimony and we find that was appropriate, don't we have to give some deference to the lower court's weighing of that expert testimony? Yes, Your Honor, but I think that the lower court acted in a manner which, with respect to that expert testimony, went beyond the scope of what it had the power to do in light of the evidence that was presented to it. The lower court did admit Mr. Smith's testimony as an expert. It concluded that Mr. Smith's testimony was valid as an expert based on his qualifications that we presented to the lower court. Right, but then she concluded that the T3 test was too speculative, correct? He said it was unproven, Your Honor, and what we would say is that there was no d'Albert hearing by Judge Danich. He basically divided up the report and said, I accept these conclusions, but I don't accept this other conclusion with respect to the way in which HUD processed these applications. I will say that Mr. Smith was intimately involved in filing of scores of applications under the preservation statutes. He knew the process very, very well. That was his chief experience with these statutes, was assisting people in making this undertaking. We presented his testimony and his qualifications with respect to that test 3, and we think we grounded him very clearly on the nature of what he had done. But the government offered no contraverting testimony. They didn't bring in their own expert. They made a number of allegations with respect to Mr. Smith, but they never attacked on a substantive basis the conclusions that Mr. Smith reached in that test 3. So I think that the answer is that the court has to weigh the testimony, obviously, of an expert and make the best use of it. But for the judge to conclude, for Judge Danich to conclude that test 3 was unproven, and that was his language, without conducting a doctorate hearing, we think went beyond his powers and exceeded... Can we deal with that? Please turn to the issues, the major issues of law. Well, as you said, when we were presenting these issues to the lower court, beginning with the ripeness issue, we presented testimony from Mr. Smith that we just discussed. We also presented testimony of our individual owners based on their many years of experience. None of the owners' testimony was contraverted. We presented declarations, we presented deposition testimony, and we believe that that testimony was correct. When Judge... I'm sorry, when Judge Danich looked at it the first time, he concluded that it was correct. Are you still talking about ripeness? Judge Newman asked you to move on to some of the other issues. In terms of weighing the evidence and so on, of course, we appreciate that this is significant, but we need first to cross the threshold question of the issues of law. Thank you. What I would say is that when... This is the group that we've been talking about, these appellants that I just mentioned. These are the parties who actually appeal to this court on the issue of ripeness. There are other appellants who did not appeal because they prevailed on the issue of ripeness. Although we don't think those issues are properly before the court today because the government does not, to begin with, does not file a cross appeal, which the court's rules require. The cross appeal rule is pretty specific. It says you have to file a cross appeal if you want to change the judgment. Wouldn't the government's alternative arguments leave the judgment of dismissal in place? Well, I think what the court has said here, looking at the Lazar decision, is that when a party has lost an argument and has not appealed it, where the result of acceptance of the argument would be reversal and modification of the judgment rather than affirmance, the judgment with respect to ripeness is that the claims of the Biaforas and the other claims of FEDFOR 3 and FEDFOR 4 that were not put on appeal conclude those parties' claims were right. But those parties' claims were all rejected either on collateral estoppel or the right to prepay argument. And so the judgment isn't a judgment on ripeness. Ripeness is an issue. That's not a judgment. The judgment is the dismissal, and on the dismissal, I would have rejected the government's brief as a cross appeal here had they filed it and insisted that they don't get a yellow brief and a rebuttal brief, that they have to go back because they would not affect the judgment. So why don't you address the issue directly if you're so inclined? I'm very inclined to do that, Sharon, because I think on the merits, these plaintiffs' claims clearly were right. When we were before the court the last time, the court— We appreciate their right, but at least in my view, we still have to cross the substantive threshold of the right to prepay for the contractual arrangements in relationship to the regulations. Thank you, Your Honor. There were four appellants that had to address the right to prepay and were appealed on this grounds. Those were Biaforas, the Belian Limited Partnership, the Thetford III Limited Partnership with respect to Margaret North and Holiday Town, and the Thetford IV Partnership with respect to Stewart Creek. The issue here, obviously, the government has raised is, did these parties have a right to prepay their mortgages? In our argument, Your Honor, in our view, the government's argument is revisionist history of the worst sort because the government is saying to the court directly the opposite of what it said internally during the relevant time period, and to the public with respect to the rights that these notes carry. Weren't those regulations and issues expressly amendable? They were amendable, Your Honor, but they never were amended. And we believe that the proper way to look at those regulations is that the notes that our parties entered into derived from what the regulations said at the beginning of the program and continue to be in effect during the relevant time period. But if we accept your argument, I mean, you concede that the notes themselves and even the use agreement with the government does not have any reference to a right to prepay. It doesn't, Your Honor, but I think that the important thing to understand... Well, actually, to be clear, you said it doesn't. It does. It says you do not have the right to prepay, right? Judge O'Malley's question was, does the note itself have ever mentioned prepayment, and doesn't the note itself, like at JA-160, expressly say, you may not prepay? We do not disagree with the language of the note that you just read. But what I would say is this. I think it's an important distinction to bear in mind. If you look at the regulatory system that was established by HUD and by that regulation that was in place under which these notes were written, it created two alternatives. If you were a limited-dividend entity, and all of these appellants, all these plaintiffs, were limited-dividend entities, and you waited 20 years to prepay after the final enforcement date, and you were receiving grant supplement payments, you couldn't prepay. If you were not receiving those grant supplement payments, and you were a limited-dividend entity, and you waited 20 years, you couldn't prepay. There were two alternatives, and only two alternatives created by HUD's scheme. And HUD drafted these notes. There was not a fair alternative. It was impossible. When you said HUD drafted these notes, HUD didn't draft the mortgage notes. You and the mortgage lender drafted the mortgage notes, or your client did, right? Well, they were in the forms that were supplied by HUD. These were HUD documents. HUD's not a party to those notes, correct? HUD is not a party to the notes, but it did sign the final endorsement agreement. Right, agreeing to provide the insurance. That's right. So I'm confused. You and the lender signed a note that said, no right to prepayment ever, despite the fact that there was a regulation that would have allowed you to create a mortgage that could be approved by HUD that would allow for prepayment at 20 years, right? We did not create this form at the time the parties entered into it. This was not a form that the parties themselves drafted. There are other plaintiffs in here who had the right to prepayment in their mortgage notes, and so you could have done that alteration, could you not? To my own knowledge, Your Honor, this was the form that was given to the parties to sign, and this is what they did. There are several different variations of the notes over time that have been used and were sanctioned by HUD. In fact, Setford 3, which is the same party, had some notes at the same time that had a right to prepay and some notes at the same time that didn't have a right to prepay expressly in the note. So it's not as though you could claim that they weren't on notice that a note could be written that included a prepayment option because that single party had notes going both ways True, Your Honor, but I think it's also clear that under the regulations that those notes were issued under, the parties knew what the regulations wrote, and the regulations wrote, as written, simply stated that if you were receiving rent supplement payments, you couldn't prepay, and if you weren't receiving rent supplement payments, you could prepay. But under your argument, if we took it to a logical extreme, wouldn't it be true that any time a private party is entering into a business relationship in reliance on what regulations said, could then argue this kind of taking every time the regulations were changed? But let us be clear, Your Honor, the regulations here were not changed. Well, the statutes were issued that overrode those regulations, right? That's the nature of the taking that occurred, Your Honor, but what we're saying is that when the BIO4 was entered into their notes at a very early point, they knew what the regulations said. They knew the regulations said that if they were not receiving rent supplement payments, they were eligible to prepay. And indeed... No, this is the part I don't understand. You keep saying that the regulation gave them a right to prepay and somehow that trumps the contract. I don't know where you got that from, because the regulation that I'm reading, 221.524, which does outline instances in which prepayment is possible, is under the heading eligible mortgages. And there are lots of different provisions, like the one right after 221.524 says the mortgage may contain a late fee clause, right? So each of these provisions in this regulatory framework are things that the mortgage note is allowed to contain that would otherwise still make it eligible under the HUD program. It doesn't mean the mortgage has to. For example, the mortgage doesn't have to have, it just may contain a late fee clause. So HUD could approve a mortgage and it could satisfy HUD whether it had a late fee clause or didn't have a late fee clause. Why wouldn't I read the prepayment privileges section the same way? HUD is willing to approve mortgages that have prepayment clauses as long as they meet certain conditions. HUD's also willing to approve mortgages that have a no prepayment clause, but they're only going to approve the prepayment clauses if they meet the conditions articulated in 221.524. So why, since the entire regulation is set out listing the options that could be included in a contract, am I suddenly going to say every one of these options automatically has to apply to every contract? As I read this regulation, what it's saying is that if you are an eligible contractor, if you are coming into the program, the program will permit you to prepay without HUD consent if those three conditions in 524A are satisfied. Why? I don't understand why you read it that way as opposed to this is one of the conditions that is allowed to be written into eligible mortgages since every other condition surrounding it is such a condition. What I say is, Your Honor, if you look at what HUD said about this consistently over history, they agree with my interpretation. Well, that's important because certainly if the agency has expressed an interpretation of its own regulations, that interpretation is entitled to deference. So where is it that the agency has interpreted this regulation as giving you a right to prepay even when your mortgage is set to the contrary? Well, we would cite you back to at least two sources. The preamble from the 1991 LIBRA regulations. Tell me where in the appendix I could find that or specifically. Because I thought you might point me to the proposed rule in the Federal Register. Is that one of your two books? Yes, Your Honor. But you're starting with a different place, and so I don't have that one handy. No, that was the 1991 proposed rule. Oh, that is what you're starting me with? Yes, Your Honor. Okay, I have that handy here. And what we put in the language in our brief, and what it says there is that HUD was specifically aware at the time that it put out this regulation in 1991 that there was various and conflicting languages in the notes that it said. In some instances, the notes actually say that you may prepay without HUD consent, and HUD at that time said that's not true. If the note says you may prepay without HUD consent, we're not going to read the note that way. Okay, now if I agree with you, and I think you have a strong case on what is actually written in 56 Federal Register 202-262 about what HUD is saying here, but an error statement made in a proposed rule that was never... I can't figure out. I couldn't figure out, but I can't tell whether the rule was ever even adopted. And I know what the actual rule was, and we've done some looking. But so is that tantamount to HUD's definitive interpretation of this regulation such that that statement ought to be, you know, a thought-through position by the government, which is therefore entitled to deference? I believe it is, Your Honor, because HUD came back to that... the Office of General Counsel came back and cited to that provision several years later in the 1995 memorandum from the General Counsel, which was also provided before. It said the preamble and interim rules for LIPRA... Can you direct me in the J.A. to exactly where the General Counsel... I believe it's in J.A. I have the Thetford one handy. I only brought one because there's so much overlapping. And I think I have the Bias Flores reference here, Your Honor, which is 097, if I'm not mistaken. I think J.A. 95, my law professor told me. Is that right, Cassius, 95? All right. Okay, here's... I got the opinion now, yeah. And in the... Here, Mr. Price, this is the one. Here, Mr. Price, May 1st, 1995. I believe that's right. And there's an earlier one in 92 as well. But if I may, I think the 92 one is actually more specific and more useful here because... So J.A. 92 to 94? Right. Okay, J.A. 92 is the July 17th, 1992 one, legal opinion. Yes. And that was wrestling with the specific question that these particular appellants face because each of these appellants began with a rent-supplement contract. That was the HUD program that applied before the Section 8 program was adopted. HUD persuaded the BIOFORS and the other parties to terminate their rent-supplement contract and enter into the Section 8 contract. And at that time, the General Counsel specifically addressed the situation that these particular plaintiffs faced where a rent-supplement owner converted to Section 8 assistance. And the court said... I'm sorry, the Office of the General Counsel said if the rent-supplement is converted to Section 8 assistance, the project would no longer be considered a rent-supplement project, would no longer be considered a rent-supplement contract. In other words, it was moving from that first aspect that I described a few moments ago to the other basket and would not be subject to the prepayment prohibitions in Sections 221, 524, and 23630. Rather, a limited distribution mortgage or which is not receiving rent-supplement assistance would be permitted to prepay its mortgage without HUD consent after 20 years from the date of final endorsement. So I think that the 92 General Counsel Memorandum is saying, making the distinction that I made, if you were not receiving rent-supplement, you moved from the basket of people who couldn't prepay to the basket of those who could, and there was no third alternative. Okay. So I completely understand your argument now, and I think it's a very good argument. The one question I have for you is how does this regulatory bestowed benefit, the right to prepay, which you expressly don't have in your contract. Your contractual right says no prepayment. So the federal government has come along in whatever benevolence it has and decided to nonetheless allow you, under certain limited circumstances, to go ahead and prepay. How does that turn into a contractual right that you have a vested property right in? Because I think what, especially the General Counsel's Office was saying in 1992, is not that we're conferring something new on people. This is a right that was latent from the moment that they entered into these contractual arrangements. The regulatory system was set up by HUD and under which these notes were derived and executed by HUD when it finally endorsed them. That system allowed for only the two options that we're talking about. But that can't be right, because all these contracts expressly say to the contrary, and they were contemporaneous. So these contracts were under this scheme, and yet HUD, you said, provided you with the clauses for the contracts, and the HUD clauses said no prepayment. So it can't be the case that HUD had, as an agency, decided there were only two instances, prepay under these conditions or prepay under these conditions, because they were providing you with contracts that said no prepayment. So it can't be a reasonable interpretation that they believed prepayment could never be prohibited. But that's what these excerpts that we've located. We asked the government to provide us with evidence or documents discussing this, right? And we found these materials and what these materials uniformly say. And it's manifest that when HUD was looking at these issues, they were looking at the contracts. They were trying to figure out what the rights of these people were, and they were not saying that we are giving these people something different than what they had at the beginning. In 1992, the Office of General Counsel made it very clear we are confirming what the rights of these parties are pursuant to these notes. And if the note doesn't conform to what we established, the note must yield to the interpretation which we are providing to you today. And I think perhaps the best evidence of this is given in the Biosphorus case. Well, but I'm having trouble with that impression of yours. I don't understand HUD to be rendering an interpretation of what you meant at JA-190 when you said the note may never be prepaid and you signed that document. I understand them to be saying, as they did in the Federal Register site you pointed me to, if there is a conflict between the note and the reg, the reg will supersede the prepayment prohibition in the mortgage note. So they acknowledge that the contractual right has a prohibition, and they're saying the regulation is going to supersede it. The word supersede means come after, right? I mean, it has a natural meaning in the English language. So they're not saying I'm interpreting the contract as never having allowed it. But they're saying we're going to replace that term and have you instead follow the regulation, which gives you a benefit that you didn't previously have. Well, I think that, you know, if you put the various statements that the agency has made together, I read the agency as in fact saying that if you look at the system that was put in place, these notes don't exist independently. They came from the program that was established, the 221 program, the Section 236 program, to carry out a mission. HUD created, HUD took the statute that empowered it, drafted regulations to put into effect, and then issued regulatory agreements and the form of the notes in order to carry out its mission by obtaining the participation. Let me put this in another direction. I don't think that anybody has argued that HUD could not enact a regulation which somehow affected or changed the contractual relationships involved in the borrower and the lender and HUD. The question, the legal question, isn't it, one of whether in so doing, this was a taking of a right which had been previously vested. As to how it was previously vested, we can consider. But if in fact it was previously vested, we agree that HUD could say, no, you can't do it. Was this a taking or not? Isn't that what this case is about? Yes, Your Honor, that's right. And our view is that when they entered into these notes, all of the accounts entered into these notes, with the understanding that when, so long as they were receiving supplement payments, they could not exercise a right to prepare. They didn't have that right. But the extremely complex question, as you and Judge Moore have been discussing, is whether, in fact, a right was previously invested between the various contracts and regulations. And whether a regulation can override a contract in order to divest a right previously vested. As I said, Your Honor, I think that our view is not that something new was created in 1991 when the LIPRA regulation came out, or in 92, or in 95, when the Office of General Counsel explained what was happening. What, in 92, the Office of General Counsel did was essentially to say that for those people, like these appellants who were persuaded to leave their own supplement program and come into the Section 8 program, what happened at that point was that they were able to move from the basket of people who, at the beginning of this program, were not allowed to prepay, into the basket of those who were. That right was latent at any point for anybody, so long as they weren't receiving their own supplement payments, they were eligible to pay. I don't think anybody would debate that these property owners were sort of sandbagged by the government a little bit. That the government encouraged them, that the government told them they were going to be able to do this. But the question is, does that become a contractual right? Did those regulations create a contract between you and the government, or is it a contract between you and the note holder that is abrogated? That's the difficulty here, because they can have regulations that induce you to do certain things and then ultimately change those regulations, or Congress can, by statute, override those regulations. And I think that the answer is, Your Honor, that when the program was founded, this right was built into all of the notes that were issued by HUD. What HUD was saying in 1992 and in 1995 when it looked at this, is that everybody in this program had a right to prepay after 20 years without HUD consent if they were a limited-dividend mortgagor and were not receiving rent supplement payments. So who is this contract with? Well, the actual terms of... I think that this clerk in the Schrodinger Gardens case originally said that the contract was between the mortgagee and the mortgagor. HUD endorsed that. So the contractual agreement was between those parties. But, as I said, these notes were prepared by HUD. They were the offspring of HUD. And HUD is the party who is clearly in the best position in terms of being able to say what the rights were that these notes conferred at the time they were created. Can I ask you something about the general counsel's opinion in particular? The one that you're citing, establishes uncritically the belief that there was an overriding contractual right to prepay sort of throughout. The paragraph you read to us at the bottom of 93, the very end of that paragraph continues and says, LIFR requires, in order for housing to be deemed eligible low-income, there must not only be the right to prepay without HUD's consent, but this right must have existed by regulation or contract, which was in effect prior to February 5th of 1988. So isn't this general counsel's opinion actually recognizing that you don't automatically have a right, that the right has to have existed in the contract itself for it to arise? I've always said that that language, Your Honor, is confirming our position because our position is that this is a latent right that was built in to all of the contracts. Then why did you sign a contract that said expressly the opposite? Because that was the one that was provided to us at the time. If you look at the... There are many other, obviously, many other plaintiffs in the United States now below. Many of them have language that follows, tracks very closely this particular regulation. This one does not. I admit that. But it would be very difficult for me to understand a situation where these contracts that were signed pursuant to the same program under the same regulations that offered exactly the same set of rights and benefits by participating in the Section 236 program would be deemed to somehow truncate a right that everybody else who participated in the program had pursuant to the terms of the regulations that led to the drafting of these notes. Because then you end up with parties who are like everybody else, except for the fact that by the time they entered into this contract, at the very early point, they were receiving rent supplement assistance under those contracts and entered into notes that so long as you're getting this assistance, you can't prepay. Isn't the language in the 1995 letter at JA97 stronger than the language in the 1992 letter? I'm not sure why you believe the 1992 letter is more powerful for you. Well, I'll accept the court's view, which is more persuasive. I simply think that the 1992 document is useful because it's addressing the particular situation that we're facing here. The other, the 1991 statement, is extremely broad. And it says, if a note says that you can prepay without our consent, you can't prepay. It also says that if you can't prepay because, you know, it's a factual item because at the time you were getting rent supplement assistance. If it says you can't prepay and you're not receiving that rental assistance, you can prepay. Do you agree? I'm just trying to understand how your argument is bounded. I mean, we're having this argument about whether there was a contractual right because I think that we're all probably on the same page, but I want to make sure that if the government simply bestows a right by regulation and then changes the regulation and takes the right away, that that isn't in the circumstance of taking. Right? I mean, if you didn't have a right, you unequivocally had no right to something and the government comes along and creates it, raises it. Say welfare, okay? Welfare. You are not a welfare recipient. You've never been a welfare recipient, but there's a welfare program that you could be eligible for that would otherwise exist. The government has bestowed it as a benefit on people and then the government by regulation takes the program away. Suddenly, you're in a situation where you would have benefited from that program if it continued to exist. You don't have a vested property right under that circumstance to claim the government didn't have the right to take that program away, right? Right. You agree. Okay. So, we're in agreement that if the government bestows a regulation, the government changes that regulation. That doesn't give you a basis for a taking. You know, the branch and the white case address those situations. Yeah, we agree with that, right? That's right, Joanna. Okay. I want to make sure. But this is not that case. I understand your arguments. I just want to make sure that we're all talking about the same thing. That's right. So, that's why the contract portion is so important to you, why it's a contract, right? And exactly, because we think that that contract stems from the regulations, and that contract embodied those rights in a latent manner to come back later. There are several other issues that need to be discussed, such as the issue of preclusion matter with respect to the Fed for four. It was my understanding the court was going to allocate certain time to, on a case-by-case basis, certain property-specific matters. I was planning to discuss that during those sessions, but if you'd like me to get into the issue of preclusion. I think we appreciate that this fundamental question, depending on how it's answered, will affect all of the other issues. No. The issue of preclusion matter, Your Honor, only addresses the Fed for four, because it alone was the sole party. It was a party to a prior litigation. Right to prepay only addresses some, and collateral estoppel only addresses others. In fact, the only one that is in both is Stewart's Creek one. I have a handy-dandy chart. My locks are prepared. That is property by property, issue by issue. I think we should all compare our charts, Your Honor, but I think we've all got similar charts like that. But the issue of preclusion case applies to all of the Fed for four, to all of the Fed for four, because all of the Fed for four was the party. But interestingly, and this is the part that surprised me, am I wrong about that, the earlier Fourth Circuit case, only Southgate, so of the one, two, three, four, five, six, seven, eight, nine, ten, eleven separate properties that compose Fed for four, with eleven separate mortgages and eleven separate sets of circumstances, only one of them, Southgate, was at issue in the Fourth Circuit decision. Am I right about that factually? I believe that is correct, Your Honor. I think that that was the only one that was actually correct. How can collateral estoppel apply when our court has clearly indicated that every one of these things has to be taken case by case because the circumstances of the mortgage can be different, the circumstances of the geography where the property is located can be different, your future plans for the property could be different. So when our court has said that every one of these has to be done case by case, how can collateral estoppel, which didn't address all but one of the properties, the Fourth Circuit opinion, how can that be resolving the same issue? That's our problem as well, Your Honor, because the rules are that for collateral estoppel to apply, the legal and factual issues must be identical, and they are not. There is no overlap with the court indicated. Is there some tension here between the argument that you make on the statute of limitations issue, assuming that we get to it, and the argument that you're making here? Under the statute of limitations issue, you argue that the fact that there are different properties doesn't really matter because it's really a centralized question that relates to the petitioner or the plaintiff. Right. Well, I think what we said with respect to the statute of limitations issue is that in all circumstances, the Plaintiffs were alleging the same basic injury, a taking, and pursuant to the statute. So on the one hand, the basic claim is the same for all of those properties, but the proof of how that taking arises and the evidence that is necessary to demonstrate is extremely fact-specific. As the court has, I think, indicated on numerous occasions, any regulatory taking claim is a very ad hoc factual discussion. So we think under Rule 15c, it's very clear that those claims with respect to the Fedford properties that were brought in specifically amended later clearly relate back to the original complaint because that complaint laid out the nature of the allegations that were being made and the impact that this statute had on this plaintiff. And Fedford is one of the, the Fedford 3 and Fedford 4, I believe, are the only two plaintiffs from the lower case that had multiple properties. Okay. And then in the Fourth Circuit, your challenge there was an as-applied, I mean, a facial challenge as opposed to an as-applied challenge. Exactly. The cases were very different. In the Fedford 4 case, which was decided in 1990, it was a direct attack a due process attack on the LIPA at the time. LIPA had not been enacted at the time of the Fedford 4 decision. So the only challenge that we could make was with respect to the LIPA statute and it was simply a broad facial attack on that. Whereas, pursuant to what the court told us to do when it issued its decision in this case in 2006, the issues now before the lower court are as-applied regulatory takings claims which are fraught with numerous factual and property-specific issues that are necessary in order to show that kind of a... Speaking of things that I know I'm moving backwards here, speaking of things that the court sort of told you how to do, I'm trying to understand why Mr. Smith did not use the analysis that was sort of endorsed in Janneke 2 for his rightness. In other words, his T1 and T2 analyses don't seem to mirror the statutory requirement as tightly as we contemplated in Janneke 2. We thought, Your Honor, that when we looked at the approach that Mr. Smith was taking, it had very strong mathematical objective measures using the methodology that HUD itself had developed to determine who could and who could not prepay. I don't think there's any one way to do this. I do think it's interesting, I think, in his original... I'm sorry, in the motion of the order on reconsideration, I believe that Judge Sandwich said that he felt that Mr. Smith had provided information that was akin to or similar to, in many respects, the information that had been brought forward in the Seeding and Gardens case. And the methodologies that he used gave us a degree of mathematical precision. You were either in or you were out, according to Mr. Smith's analysis. And all of this, just so that I understand, is going only to the administrative exhaustion point, right? The Smith 1 and 2 and the validity thereof is simply going to whether or not you should have had to play this out before HUD, before coming to district court after being rejected for prepayment, or whether you should be allowed to go straight to district court. Am I right? That's right, Your Honor. This isn't on the merits of whether you have satisfied a taking, this is simply on whether or not you have a right to get your foot into the courtroom at this point. That's exactly right, Your Honor. I just want to make sure I understand the context. Certainly. This is a case that's been obviously taking some time to get to the decision we are now proceeding with the takings discovery for a group of plaintiffs in the lower court. But all of this was in order to do what the court asked us to do, to come forward with fact-based, property-specific, detailed information explaining why these plaintiffs could not satisfy the very strict standards that the statute provided, as the court said in Seneca. If you don't satisfy those mathematical requirements, you cannot, HUD cannot allow prepayment. And what Mr. Smith's test did, we felt, test one and test two, was to allow the court to assess on a very detailed and methodologically correct basis whether those properties could in fact repay their wages. So your point is that what we said in Seneca too is that you have to prove certain things, and you're just saying that we didn't dictate a methodology. I think that's very correct and very true, Your Honor. Judge Damage felt that Mr. Smith had come up with a testimony that was very strikingly akin, I think this is his language, to what was in Seneca. But I would also say that I don't think the Seneca court established or limited the specific nature of the proof that the party needed to come forward with in order to satisfy those standards. Your last issue is tax limitations. I know you've addressed that to some extent already, but aside from your cross-appeal argument, how do we, is there any deference that we are to give to a lower court's determination of relations back, or is this a purely legal analysis? I believe that this kind of a decision because of the, I still think that the court, this is clearly reviewable by the court, but the fact findings, the specific facts that were found by the court in support of the statute of limitations, this is a jurisdictional issue, in the Court of Federal Claims are, my understanding, are reviewable and make a clear error. And Judge Damage did find, I'm sorry, it was Judge Sweeney at the time, did make a certain number of very specific findings and found that Thetford III had been appointed since 1993, that Thetford III had served in regulatory takings claims for their properties based on LIPR at the time. No new claims or theories of liabilities were added by the inclusion of the additional properties, and the amendment only identified all the Thetford III properties encompassed by the existing regulatory taking claim. Let's hear from the government on these issues and we can go back to the particulars as appropriate. Thank you, Your Honor. Mr. Harrington. May it please the Court. Before the Court are as applied regulatory taking claims brought by the owners of 21 moderate and low-income housing projects. The owners allege that LIPR affected the taking of a contract right to prepay their mortgages with a private lender. Two owners, Carachat South and Carachat Muskegon, also allege that a LIPR affected such a taking. Now these claims fail for several reasons. First and foremost, the taking claim of all of the plaintiffs as to all of their properties are not right. In addition, the mortgage notes for six particular properties do not contain the contract right that was allegedly taken by the United States. Issue preclusion bars the claims asserted by Thetford IV as to their properties and claims about ten properties owned by Thetford III and Thetford IV are barred by the statute of limitations or at least they would be barred by the statute of limitations if those claims were right. Can we start with issue preclusion? Gladly. Okay, because I think this is one that we can dig into quickly. Isn't there a distinction between an as-applied challenge and a spatial challenge? In the takings context, there certainly is. So in this particular case, what the Fourth Circuit considered is whether there was any possibility that any property could ever qualify. And they said that you can't prove futility  But they didn't decide that these particular plaintiffs would never be able to make an adequate challenge, did they? I don't think that's quite right. The Thetford IV decision was, it was not a taking case, it was a due process challenge. And the plaintiffs said, we don't need to go to HUD to assert a due process challenge as to us. It wasn't simply everybody, it was as to them. Of course, you have to say that it's me, but their argument as to why that was so was because they said no one could ever qualify. No, they didn't say that no one could ever qualify. If you look at the decision, they say that we couldn't have qualified. And that's what the court talks about. The court talks about it, they raise four different arguments as to due process as to why the district court's dismissal of their due process claims were improper. One of them was that you don't have to exhaust administrative remedies when you're making a constitutional challenge. One of them was that you don't have to exhaust administrative remedies because, as to us, exhausting our administrative remedies would be futile. The Fourth Circuit... Why? I didn't see them making the arguments that they make here at all about futility. So how... I mean, the Fourth Circuit even recognized your completely unsubstantiated, generalized argument about futility isn't going to ever cross the hurdle. So what... I don't understand them having made the argument before the Fourth Circuit that they're making here today, which is these precise properties would never have been approved for prepayment by HUD on the basis of their historic record of refusing to prepay, because the only properties at issue in the collateral estoppel are all ones that satisfy Smith I or II. These are not ones that hinge on just Smith III, which Judge Dammisch found valid, I or II. So I understand them saying these properties are properties which we can establish legitimately. I know you don't agree with that, but legitimately can establish are entitled... would never be approved by HUD, and therefore it would be futile. I don't understand that to be the argument that they made in the Fourth Circuit. I've looked at all the briefings, all the way back to the district court. That's not the argument they made there. Well, I think you need to go back to... and we're now getting into futility, honestly, Your Honor, and what is the standard for addressing futility. Well, we're getting into futility because you prevailed on collateral estoppel, and the collateral estoppel was based entirely on futility. Well, yes, absolutely. It seems that we have to actually... since collateral estoppel requires the identical issue having been resolved below, you have to look at what was the issue that was in fact resolved below, right? And the issue that was resolved below in Thetford 4 was did the property owned by Thetford 4... they were dealing with a specific property. They were dealing with Southgate, as one of Your Honors mentioned during Mr. Kelly's argument. They were specifically focusing... that was the claim that... that was the property that Thetford 4 put forth in that litigation. So this is... I'm going to ask you two questions. Sorry to interrupt you, but since none of the other properties at issue in this litigation were even at issue in the Fourth Circuit decision, how the heck can we have collateral estoppel? Because we've made it clear you've got to have property-specific, case-by-case, mortgage analysis. So for everything other than Southgate, how could we conclude that a decision rendered in the Fourth Circuit about what might have been futile with regard to Southgate was or wasn't futile with regard to all of the properties not considered in that decision? How could that create collateral estoppel? I think that it doesn't create collateral estoppel, Your Honor, because what you have to address in looking at exhaustion is whether or not... the fundamental question is not whether or not, as to a particular property, HUD would or would not approve prepayment. The fundamental question is could HUD have approved payment if the administrative process had been exhausted. So it's looking at the possibility, what might have happened, as opposed to prediction as to what the plaintiff or what the court thinks would have happened. I understand, but that kind of morphs into your one and two on Smith and your complaints about Mr. Smith. And for now, just assume... I mean, we'll get to that in a separate argument or discussion. But assume that Smith one and two prongs otherwise established the futility such that these properties could have been avoided waiting for HUD because these are all properties that Smith one or two was relevant to. So if you assume that, then I don't understand how it's at all the same question that was resolved in the Fourth Circuit vis-à-vis the properties that weren't even at issue in the Fourth Circuit case. Well, I think that's directly contrary to what the Fourth Circuit found, Your Honor. I think that the Fourth Circuit found that applying to HUD for permission to prepay... And it's worth mentioning... Let me finish that thought. That applying to HUD for permission to prepay was something that you could possibly get a result where HUD approved prepayment. Now, the reason for that is because of the process. The reason for that is the process established by the preservation statutes. And that's that the owner presented a plan to HUD. It wasn't an abstract, can you prepay or can you not prepay? It's the owner presents a plan to HUD and then under the statutory standard, HUD evaluates the implementation of the owner's plan. But we've had a couple of cases since then in this court in which we've upheld futility. And so if your argument were right, we couldn't have upheld futility in those cases and allowed those cases to go forth. I think you're talking principally about what we've referred to as the Scenic 2 decision, Your Honor. But you also have to recognize the Greenbrier decision in which case, in an earlier case, in which court held exactly that. But they're both, I mean, our job, because those are both panel decisions, is to attempt to reconcile the two. Absolutely. But if you're arguing that you can never show futility, then you're actually saying that Scenic 2 just got it wrong, right? Your Honor, that is not my argument. I think that what Scenic 2 did was the same thing that the Supreme Court did in its student decision. It said that based on what happened in this case, there is no dispute as to four model plaintiffs, and only as to four model plaintiffs, there were more than 40 plaintiffs in the case. As to the four, there may have been 38. But there were, as to those four model plaintiffs, there's no dispute that HUD would not have allowed them to prepay. Right, and we allowed all the other plaintiffs to go back and to establish the levels of proof that might be necessary for them to prove the same thing. The court allowed them to go back. That is correct. It's also important to recognize what this court did, though, in the prior decision in this case, and how the court handled Scenic 2 and how the court handled Greenbrier in the decision in this case. The prior Anaheim Gardens decision, the court looked at the pleadings. It was analyzing this case as a motion to dismiss under Rule 12b-6. And it found in the pleadings allegations of administrative delay. It said, at page 1315 of that decision, that unlike the plaintiffs in Greenbrier, appellants have said that they applied for relief under LIPRA, but that HUD has so severely delayed in meeting its requisite deadlines under the statute that they have, as a result, missed their own statutory deadlines. It said that Appellant Thetford claims that it filed a notice of intent and should have received a Preservation Capital Needs Assessment within a certain period of time, and mentioned other allegations of administrative delay. And then this is key. It said, because taking claims based on administrative delay could be right without final decision from HUD on prepayment, the court reversed and remanded... It said, we reversed and remanded for the development of facts on whether appellants taking claims are right. That's at 1317. And I can quote the exact language for you. It said, because appellants have begun the application process but have run into delays or are missing information on the value of their project because of HUD delays or refusals to provide the requisite appraisals and PCNAs, their claims, if proven, may fall into the administrative futility category and be right without a final decision. I guess I'm not really understanding your argument. I understand what you're saying, but I'm not understanding how it's responsive to whether or not they can argue before us futility which wasn't decided by the Fourth Circuit, which is the collateral estoppel point. So tell me how the argument you just made about whether there could ever be a temporary taking by virtue of administrative delay, which I consider, quite frankly, to be a separate and unrelated point, tell me how you're justifying the collateral estoppel holding by the Fourth, you know, in this case, seems to be the Fourth Circuit on the basis of that language about a temporary taking. Explain, weave it together for me, I'm not getting it. And I was talking about futility generally around a not-so-much collateral estoppel, but my understanding of the Fourth Circuit's decision is that the Fourth Circuit said, as a general rule, where there is a discretionary administrative process, as here, that exhaustion of that administrative process is required. And exhaustion of the administrative process as to Thetford IV will not be excused because of futility. That's my understanding of what the Fourth Circuit did in Thetford IV. They said that the failure to exhaust... If that's how broad the holding was, then that would be inconsistent with Danica Sioux and Anaheim Gardens, would it not? It is not at all. No, it is not. It is not inconsistent with Sienica II because Sienica II, as to the model plaintiffs, simply applied the bedrock proposition is if there's no dispute between the parties. And the United States did not argue that the fact established at a prior breach of contract trial meant that there was a possibility of free payment. We did not claim that there was a possibility of free payment as to the four model plaintiffs. It was an undisputed proposition as to the four model plaintiffs that they couldn't free pay. Suppose that HUD has discretion to grant prepayment and that a thousand different people have applied with identical circumstances and HUD has denied every single one of them consistently the right to prepayment, even though they could have, within their discretion, allowed prepayment in those instances, but HUD has really pretty clearly and categorically rejected prepayment under their discretion for people who have certain types of criteria. So now the thousand and one person comes along with the identical facts. This is not our case, don't worry, I'm not trying to suggest it is. But the thousand and one person comes along. Technically, HUD does have the discretion. It would be awfully hard, it seems to me, for them to grant that discretion in light of number one thousand and one, given that they rejected it for the first thousand, but theoretically they have the discretion. Is that a circumstance in which futility could ever exist to allow the thousand and one person to skip the administrative process and go straight to district court? Or would your position, which seems to be whenever there is discretion, you can never have futility. Your position would seem, at its furthest point, to trump futility even in that clear case. So I want to know where exactly you are. Your Honor, our position is that you would have to exhaust there. And I would point you to the Korrestal decision of this court. It wasn't quite as extreme as the hypothetical you just gave me. But in Korrestal, this court rejected the argument that an agency's position in other matters establishes futility. And it said that. It said, if you are seeking relief, and this applies to you, you have to go and you have to convince the agency that they've done it wrong in the other cases. And like I said, it's not as extreme as the hypothetical you gave me. But it did talk about rejecting futility in the case where a plaintiff argued that the agency's position in other matters showed that they couldn't prevail in that case. And the court said, no, you must exhaust. How do you deal with the fact that there is some inconsistency between the arguments that you're making on the statute of limitations and the arguments that you're making here with respect to issue preclusion because you responded to Judge Moore and said it doesn't matter that all those properties weren't before the Fourth Circuit because it's just really one big issue and it's all the same. And with respect to statute of limitations, you're saying, well, it's not really one big issue. We need every separate property has to satisfy the statute of limitations. Well, as to the statute of limitations, Your Honor, we're talking about ripeness here. As to the statute of limitations, you're looking at the underlying transaction and you really are getting into a merits sort of analysis, which is somewhat different than what we're talking about purely on the ripeness issue. The terms of Rule 15C of the Court of Federal Claims ask whether or not the same transaction or occurrence, I'm paraphrasing the language, but whether the same transaction and occurrence are at issue in all of the claims. And when you look at that and you look at the merits of these claims, not whether or not the claims are right, the ripeness aspect of it is very similar because you do have to apply to prepay. But the merits of the claims, when you start looking at the Penn Central factors and you start looking at economic impact, you start looking at investment expectations, those things are all very different because you are dealing with different properties, you are dealing with different towns and cities, you are dealing with properties that were developed at different times with distinct mortgages and with their own preservation history. Although, frankly, the preservation history is similar in that none of the plaintiffs here did seek HUD permission to prepay. So that aspect, at least, is similar. They went different routes as far as seeking benefits under the statute, which virtually all of them did seek under the statute. With respect, you didn't raise any of these issues to the referees, so obviously we didn't know if statute of limitations or the attack on T1 and T2 were even an issue. So what is your response to the arguments with respect to the fact that you should have cross-appealed? Well, as to the cross-appeal, Your Honor, it is exactly what was discussed earlier. This court has said that it's improper for the United States to file a cross-appeal where we are not seeking to change the judgment. The judgment here, as to all of these plaintiffs that are before the court today, is a judgment of dismissal. And we are simply providing alternative grounds for affirming that dismissal. Did I hear you say that none of these plaintiffs in any of these cases sought permission to prepay? That's correct, Your Honor. Not a single one. So, as to your cross-appeal question, Your Honor, the law on the circuit is clear about when a cross-appeal is appropriate and, frankly, when a cross-appeal is not appropriate. And, for instance, in Bailey v. Dark Container Corporation, this court said it is only necessary and appropriate to file a cross-appeal when a party seeks to enlarge its own rights under the judgment, which we are not attempting to do, or to lessen the rights of its adversary under the judgment, which we are also not seeking to do. We simply seek to affirm the dismissal. And so we are not allowed to cross-appeal. Going to the rightness issue, which we believe cuts across all of the cases here, the fundamental question is what could have happened if the administrative process had been exhausted, not what would have happened. Where there's some possibility of obtaining permission to conduct the activity at issue, exhaustion of the administrative process is necessary. And some possibility exists whenever the agency has a discretionary standard. There's no question that we are dealing with a discretionary standard here. Both ALIPA and LIPR say that HUD may approve a request to prepay. And under both statutes, HUD was directed to assess whether implementation of the owner's plan, and that's important, if the owner's plan that is being submitted would materially increase economic hardship on current tenants, HUD had to consider whether or not the availability of comparable and affordable housing, a discretionary judgment, was available if the owner's plan sought to displace tenants, and HUD was to evaluate whether implementation of the owner's plan would materially affect the availability of affordable housing in the area that the tenant's property could reasonably be expected to serve. Again, discretionary language. We said, though, in Sienega, too, that the statutory language does not provide pure discretion, that there are limits in the statute on the exercise of discretion, so it's not a circumstance that would fall within the bounds of the other cases upon which the government relies, where there is pure discretion given in the statute. I think it's important to recognize the context in which the court was talking about discretion. In Sienega, too, talking about the model plaintiffs, the court said the parties agree that HUD would not allow prepayment under the statutory standard. What we said in Sienega, too, is that you have to look to the statute, and the statute bounds the discretion. So to the extent that the discretion is limited, then HUD can't act. So that's why the court said that there were certain facts that could establish futility, because the facts would say that under the statute, HUD would have zero discretion. There's an important argument that was not presented in Sienega, too, that I want to mention to the court, and it's an argument that the United States did not make in Sienega, too. Because you're talking about implementation of the owner's plan of action, the owner is able to craft a plan of action that can satisfy the statutory criteria. Not all plans that the owner could submit would be disapproved. Now, the court in Sienega, too, was talking about a plan of action where the owner went in and was going to immediately raise rents on current tenants by more than 10%. But the fact that they could craft a plan that HUD would approve is not the same thing as them having to do it, right? Like, they could say, yeah, but we wanted high-income condos. I mean, the fact that we could have created a plan that you would have ultimately approved is irrelevant because that's not what we intended to do. If you look at what the Supreme Court has said on this subject, in the McDonald case, in Williamson County, and other cases where the Supreme Court has been talking about exhaustion and futility, the Supreme Court has said that where a project owner goes in and says, I want to build 200 houses on this plot of land, and they are rejected. They actually applied, and they're rejected. Unless the record establishes that they couldn't have built 100 houses on that plot of land, they still have to apply a second time. In Palo Zolo, for instance. But that doesn't answer my question because my question was, suppose that the record here was clear that they wanted to put up high-income, high, big, expensive condos, million-dollar-plus condos apiece. That is clearly something HUD would not have had the discretion to approve because it would have absolutely modified dramatically the availability of low-income housing in the area because none of the current tenants would have been able to stay. So if that was their plan, and if theoretically they have a right to do whatever they want with their property after 20 years, I don't understand how the fact that they could have put in moderate housing, I don't understand how that affects the futility analysis that we're discussing. It affects it because the fundamental thing that the Supreme Court has said that you have to do in exhausting is have the responsible agency establish what uses of the property would be allowed. Now, you are postulating a plan that HUD would have denied. There can be plans that would be denied and plans that would be accepted under a discretionary standard. And you have to, by applying to the agency, get a final decision that tells, that establishes how you can use the property. What you're suggesting is an iterative process where the property owner is going to spend the entire rest of the mortgage period going in in incremental steps trying to get what it wants out of HUD and being rejected time and again. That can't possibly be what the Supreme Court contemplated when you're talking about a fixed term mortgage like this. Because what you're saying is they're going to come in and say I'm putting up all high-income housing. HUD's going to reject it. Okay, darn it. I'm going to put up 50% high-income housing. HUD's going to reject it. How about 49%? 38? 72? Where can we go? So the onus is on them to keep applying until you finally say yes and then we know where the boundaries are and only then can they go to court to complain about the fact they couldn't do what they wanted to do to begin with? No, Your Honor. And I would point you to the Palazzolo decision. I would point you to the Hecht decision in this court and the Maguire decision in this court. In Palazzolo, the owner did in fact have to apply twice before the Supreme Court said we have established how this property can be used and you don't have to apply a third time. In this court's Hecht decision, the court said the, and I think I can give you a pretty close quote, that the futility exception simply serves to protect the property owner from being required to submit multiple applications when the manner in which the first application was denied makes it clear that no project will be approved. So if you apply and you learn from that application process where the bounds are under Hecht, under Palazzolo, under Maguire, you don't have to apply a second time. Why does it matter where the bounds are if the bounds are anywhere other than where you want them to be? When you have a property right that has been taken, who the heck cares what they would let you do and not let you do if you can't do what you want to do? Because to establish the taking, Your Honor, when you get to the merits... No, that's just damages. That's not futility. I don't see how that is relevant to futility. I see how it's absolutely relevant to damages, right? Because, well, they wouldn't give you everything you wanted, but they would have actually given you 90% of what you wanted. So I totally see how that is relevant evidence. I just don't see how it's relevant to the point of futility. The reason it's relevant on liability, Your Honor, and not simply to what just compensation is, is because under Penn Central, you have to evaluate the economic impact, among other factors, to establish whether a taking has occurred at all. It could be that HUD said, you can't prepay your mortgage at all. And, in fact, this Court has affirmed cases where HUD has said you cannot prepay your mortgage at all. But it is not a taking. And it is not a taking because looking at economic impact, looking at investment-backed expectations, looking at the character of the government action, there's no taking. But, once again, I understand completely how that goes to liability and the merits, just like it could also go to damages, both. But I don't understand how it goes to futility because you can absolutely bring all of that out in the course of the actual proceeding. But the bottom line is it's still totally futile for them to go through the application process at HUD because they can't get what they want. And then they want to argue that by not being able to have what they wanted, an unfettered property right to do with their property whenever they wish, that there has been a taking. Now, you and them can both bring out all of these facts in deciding whether on the merits there's been a taking, but I don't understand how that impedes their ability to get into court. But that's exactly what happened in cases like Williamson County and McDonald, Your Honor, where the court says, the submission of a grandiose plan that is denied does not necessarily make your claim right. Now, it can, under HEC, under Palazzolo, if the submission of that grandiose plan goes in and it establishes the parameters of the use of the property. What is it? Williamson County. Is this a Supreme Court opinion? It is. Does it actually use the word grandiose? I believe it does. Who wrote that? I'm sorry, Your Honor, I don't remember who the majority of it was written by. All right. Can we shift to the prepayment obligation, prepayment issue? Yes. Your reference to Penn Central, et cetera, those are regulatory cases. They don't have to do with the contractual thing. And I understand the government's arguments, but the one thing that I found kind of compelling was that the government doesn't really explain why it kept saying repeatedly, repeatedly, repeatedly that it doesn't matter what the mortgage notes say. So, deal with the 1995 letter. Let me explain that. And I think we have a quick note in our brief that touches on this. That's a little, to me it's always a red flag when someone just drops it in a footnote and it's a pretty bad fact. Well, it's not because it's a bad fact. It's because it's collateral to the issue. But what LIPRA said is that you can proceed under this statute if you are what was defined as eligible low-income housing. And that's what's discussed in these letters, what is eligible low-income housing. And LIPRA defined the term as projects developed  under regulation or contract in effect before February 5, 1988 is or will become within 24 months eligible for prepayment without approval of the secretary. The key language there is under regulation or contract. You are allowed to proceed under LIPRA if pre-1988 regulations would have allowed it or if your contract would have allowed it. And so even when you didn't have a contract that had the right in it, if under HUD's regulations superseding that contract language, you would have proceeded. You're allowed to proceed to get the benefits in LIPRA. And that's what's talked about in these letters is are you eligible to proceed under LIPRA to get the benefits that these statutes provided. And these properties that had no contract right to prepay are still allowed to proceed under LIPRA because of earlier regulations, regulations that were expressly subject to change. But nowhere, at no time, did they have a contract right. And that's what's the key for the taking plan here, Your Honor, is that the property interest that's alleged is a contract right to prepay. And that is in the case of at least S2-6 projects. Other projects did have in their mortgage notes the ability to prepay after 20 years. But as to 6 properties, they had no such contract right. And HUD regulations didn't change that. It was either in the contract, it's plain language in the contract, it didn't confer it, it was either there or it's not. And HUD regulations didn't change that. What do we make of the Federal Register site for the proposed rule where it actually says the regulation will trump the mortgage note even if the mortgage note says you can't prepay? Before LIPRA was enacted, before OLIPA was enacted, HUD construed its regulations as preempting contract language. And so if under HUD regulations you could prepay, the regulations would get you that right. The problem is that if you're basing your taking claim on a right in regulations that are law, that are expressly subject to change, your taking claim fails. The reason it fails is this Court's decision in, let me get the names right, Fern was one of the decisions. I think the opposing counsel pretty much indicated he understood the same, which is why he was pinging it on a contract right. So why then, if there was some generalized understanding at the time these contracts were entered into that you had this right through regulation that would trump anything in the language of the statute, would that be enough? No, because it's the contract right that is allegedly taken. And here we've got contracts with clear language. At the beginning and end of contract interpretation where there's clear unambiguous language is that language. I didn't look at all six. Do all six of the contracts at issue have an actual prohibition? I looked at at least two and they had actual prohibitions. No prepayment short of 40 years, no prepayment period. Do all six of them have that clause? Five of the six of them have that clause. You can never make this easy on me, can you? I'm sorry. The sixth contract we have- Which one out of the six? Do you remember which one it is? I do not off the top of my head. Millwood, Parthenia, okay. It was neither Parthenia nor Millwood. Dolly Ann, Stewart- And it was not Dolly Ann. It was one of the others. One of the Thetford ones. I believe so. Well, it has to be because there are only three left. All right. That contract was not found, but we had an admission in the record that it did not contain a right to prepay. So we don't have the actual document, but we have an admission in the record. An admission that it didn't have a right to prepay or an admission that it expressly prohibited prepayment? You see the difference I'm drawing. The difference I'm drawing is between a contract which absolutely prohibits certain prepayment and a contract which is otherwise silent where the regulations could be deemed- I understand the distinction you're making here, Your Honor, but in this particular case, the distinction is without difference. And the reason is that all of the contracts expressly addressed prepayment. And so if it didn't expressly say you could prepay, it expressly said you couldn't prepay. So because it was actually addressed in the contract, if there's a concession, then it means it didn't contain a right. You pointed out that the regulations were expressly amendable, but they were never amended, were they? They were amended once LIPRA and ALIPPA came into force, Your Honor, because HUD issued new regulations talking about when you could and couldn't prepay, what you had to do to apply to prepay. So the language in those regulations, what was required, the statutes changed it, first of all. And after the statutes changed it, HUD also issued regulations that modified things as well. So would it be your argument that the 1992 and 1995 letters interpreting the regulations becomes meaningless at that point, or is the language that was being addressed by the Assistant General Counsel sort of saying? Well, first of all, the language in the statute had not changed at that time, to directly answer your question. That said, we're not talking about interpretation of the statute in regulations where you might get Chevron difference here. We're talking about a letter about one specific property, for instance, in the 1995 letter, that is not one of these particular properties at all. So, yes, there is that letter from HUD to that owner about that property, but I think we need to be careful in saying that one letter on one occasion is a proper way to interpret the statute and the regulations across the board. But the language at JA-97 is very broad. It is not saying, and on your particular fact, this is what happens, it says, therefore, despite language in the note prohibiting prepayment, the project mortgage will become eligible for prepayment without prior HUD consent. So it says, despite language in the note prohibiting prepayment. And I believe that is talking about the old HUD regulations, Your Honor. I have to look at the language. But that is how HUD interpreted its regulations before a letter. Did the language that he was addressing, the precise language that he was addressing, change? HUD implemented new regulations, Your Honor, in 1992, in March 1992. To which he pointed, I know they're new. Tell me what about them is new. Is this analysis completely wiped out by the change, or did the change leave in place the very specific part that he was discussing? No, because the change made it so that you then had to apply to HUD to prepay. The new regulations required an application to HUD to prepay. You couldn't do it unilaterally the way the 1970 regulations allowed. So the prior, actually I didn't understand this or appreciate it by the fact, the prior regulations didn't allow unilateral prepayment. It was only the new regulations that came along and for the first time suggested that in order to prepay you have to apply? The new regulations in 1992 implemented the statutory language in LIPRA and required an application. But it was applied, was it not, after 20 years or in terms of the particular contractual arrangements that had been established for the prior law? I'm sorry. The perception of the Title VIII change was that in part it was intended to liberalize the eventual prepayment possibilities in view of changed circumstances. The new language allowed HUD discretion to allow an owner to prepay even after the requirement to apply existed. I'd like to, with the rest of my time, talk about this. Before you move on, one last thing. We're talking about whether or not these counsel letters and possibly the statement in the proposed rule, the Federal Register Statement, created an understanding about what the regulations allowed or didn't allow. What I didn't hear you say, and I want to make sure I understand your argument, though, is that all of that is irrelevant to whether there is a contractual right. I just want to make sure I understand your argument and I haven't missed it. Yes, that is absolutely correct. Even if he is 100% right about what the 92 and 95 letters indicate, what HUD will do under its regulations, even if everything... That's why I kind of don't know why you're fighting him so much. You're spending so much time fighting him that it's distracting from your true point, which I think is even if he's 100% right on the proposed rule and both counsel letters, that's still only a regulatory-based property right at best and not a contract-based. And if I've distracted from that, I apologize, Your Honor, that is exactly our point. It has to be a contract right because that's what's alleged and you don't have a right in the regulation. Can we go back to Reitman for a second? Yes. One of the things that the CFC found on reconsideration is that the government never made any specific attacks on any one of the tests, T1, T2 or T3. The government simply took the broad-based approach that they could never, under any test, prove futility. And the CFC found that that was inconsistent with our analysis in Sienega II and because there had been no attack on Smith's methodology otherwise or on the propriety of how those tests match up with 4108 or with Sienega II, they decided to enter summary judgment. So why is it, and you still haven't addressed his test at all? And that was exactly what I wanted to do, Your Honor, and allow me to do that. And the court is wrong that we did not address... I thought the judge knew we were not going to... No, please proceed. This is an important issue. Thank you, Your Honor. The court is wrong that we did not address that. We submitted declarations from Kevin East. His declarations are in the joint appendix and from Morris Berry. Mr. East was the head of HUD's preservation division during the 1990s. Mr. Berry handled a portfolio of about 40 HUD projects and was personally responsible for processing under the preservation statutes. In their declarations, they talk specifically about Mr. Smith's Tests I, Tests II and Tests III. They talk about all of them. And as to Test I, Mr. Smith's first test, he created an affordable areas list. And his proposition was that if a project was not in one of these affordable areas, HUD would have denied prepayment. Such a prohibition is contrary to the express language of the statute where it says that HUD will assess implementation of the owner's plan on an individualized basis. And the affordable areas, Mr. Berry and Mr. East both said, quote, the affordable areas list was not used in evaluating requests to prepay pursuant to the preservation statute. And they went on. They said projects located in metropolitan areas that were not on the affordable areas list remained potential candidates for prepayment. Directly contrary to Mr. Smith's so-called test, we have testimony from two HUD individuals sworn affidavits that say his proffered test is simply flat out wrong. And it's more problematic still because Mr. Smith's test doesn't track the terms of the statutory provision that showed what HUD had to analyze in terms of a plan of action. The section 4108 of LIPRA, section 225 of OLIPA said nothing about an affordable areas test. And so nothing in the statutory language spoke to this test number one. And we have two HUD officials submitting declarations saying that this test does not show that a project couldn't prepay. Mr. Smith's second test has much the same problem, that Mr. East and Mr. Berry spoke to this test. The second test sought to evaluate whether the rental market containing the plaintiff's property was soft, as the term soft was used in HUD's interim guidance for the so-called windfall profits test. How do you deal with the fact that these declarations were before the court and the court actually looked at them and said, I think these are weak and I give them very little weight? Well, Your Honor, first of all, because we are dealing with summary judgment, if we are actually dealing with what HUD would have done, we don't think that's the correct inquiry. We think it should be what HUD could have done. But if we're dealing with what HUD would have done, at a summary judgment stage, the court's supposed to give all reasonable or accept credibility and accept reasonable inferences from these declarations. Now, these declarations, at a minimum, show that simply adopting Mr. Smith's test is inappropriate on a motion for summary judgment. We have declarations controverting his test and his approach. And so at a summary judgment motion, that shouldn't win the day if what we're really talking about is what HUD would have done. The second test has the same problem in that Mr. Smith looked to see what was a soft market. And he opined that HUD would have denied an owner's plan of action if the rental market was not soft. But Mr. Smith and Mr. Berry explained that the windfall profits test was not a proxy for prepayment and that HUD could approve prepayments irrespective of whether a project passed or failed the windfall profits test. Moreover, and the court found this, Mr. Smith disregarded nine of the ten factors that HUD's regulations said you have to look at in evaluating whether a project was in an area that was soft. He ignored nine of the ten factors that HUD's regulations said you had to look at. And the trial court acknowledged that failing. All right. There'll be another chance to elaborate on this if we need. And would you enlarge Mr. Perry's time by the time we run over? We raised some new issues. Thank you again, Your Honor. I would like to address some of the discussions that the court had with Mr. Harrington. I think one of the things that comes out of this discussion is the fact that notwithstanding Mr. Harrington's arguments, it was important and the government should have used the opportunity to file a cross-appeal on the ripeness issue and the statute of limitations issue, both of which came up pursuant to their opposition memoranda, their opposition briefs, and not directly before the court. Mr. Harrington mentioned one of the authorities here which said that cross-appeals are not required except in those cases when a party is attempting to expand its rights under a judgment. And that's clearly what the government's attempting to do here. If the court, for example, concludes that the effectored for appellant's claims are not precluded as a result of the prior decision by the Fourth Circuit, that party, there are a number of different issues there, but presumably if we prevail on our claims that we have brought challenging preclusion and so forth, the effectored for would go back, presumably to be remanded to the Court of Federal Claims to pursue its takings claims because its takings claims were deemed to be right by the lower court. So for the government to say that it's not attempting to expand what it had before is clearly erroneous. It is attempting to put itself in a better position. You can't win twice. They won once on one grounds. They can't win twice. You can't... If we allowed that, do you have any idea what a nightmare it would be here in our court? Every single time there would be a cross-appeal in every case because they didn't like something that would have made them win for a different reason than the one they actually won for. That's not the rule of how you decide what is a proper cross-appeal and what is not. It would be a disaster for our court, if it were. My point, Your Honor, is that the lower court has ruled in favor of the other plaintiffs on their likeness claims. The government is attempting to subvert, essentially, the decision for all those other plaintiffs who are proceeding on their takings claims in the lower court by challenging these claims of these appellants here without having properly raised this on a cross-appeal. They can't. They're not allowed to raise this on a cross-appeal. We'd have struck it and sent it back. So they have to have a right to raise it here. Now, I understand it might well affect the ones that are continuing below. I get it, but it's not on the basis of... They couldn't have raised it as a cross-appeal. We wouldn't have allowed it. Well, I think that the other point to bear in mind with respect to this is that the government is challenging... I don't think there's any way around it. I think the government is challenging this court's prior conclusions in the C&AB Gardens case with respect to what constitutes futility for purposes of the right to this determination. There's been a lot of discussion about that, but it's clear that in C&AB Gardens, this court looked at, very diligently and very discreetly, looked at the issues of ripeness and what these statutes require the party to do in order to satisfy the futility standard here. And in doing so, the court stated that the test had changed and that in order to bring a claim, there were very strict standards in the statute that must be satisfied before I could exercise any discretion. And that is clearly not what Mr. Harrington is... what the government is arguing before you today. He wants to make an argument that something else should be the standard this court should follow. He wants to argue that apparently some initial filing must be undertaken before futility determination can be made. That is not the holding that this court made in C&AB Gardens. That's not the direction that we had when we were sent back to the Court of Federal Claims once before on this matter. So the government is making a direct attack on C&AB. In the C.C. Associates case before this court, that decision was reaffirmed, that understanding of futility was reaffirmed, and we don't see any basis for the court to adopt any other ruling here. It's very clear that unless the statute, the very strict mathematical statutes, the standards of these statutes are satisfied, HUD can't do anything. And cases such as the Heck case that the government cites are really about what happens if you make a first application, what the impact that might be on subsequent applications. Indeed, I think the Heck case is really a question about what constitutes a final decision on one application for purposes of understanding the impact that might have on later decisions. But it doesn't in any respect deal with a situation of creating an alternative rule, but to the extent that the government is claiming that we had to do something else at this point, I think it's government's tendency to subvert what this Court has said in C&AB. But their underlying argument is that Test 1 and Test 2 by Smith don't demonstrate that HUD would not have approved prepayment on these loans because they don't follow the regulatory standard that HUD was using to decide whether prepayment was appropriate. How do you respond to their argument that on the soft market point, Mr. Smith's Test 2 only addressed one of the nine or ten, I don't remember the exact number, of criteria that HUD would have itself evaluated in assessing the impact of that standard? The quick answer to the question, Your Honor, is that there were multiple reasons why HUD would have found that an owner couldn't prepay. There were ten different factors. As Mr. Smith's analysis says, all we had to find was one reason why they couldn't prepay. And if we could demonstrate that the owner couldn't satisfy that one reason, we didn't need to worry about all the different factors. So you're saying that his factors, the ten factors, are not things to be weighed and balanced, but it means you have to satisfy all ten? I know what I'm saying. Or to fail any one. To fail any one. That's all it took to pass this test. And that is correct. That's what the HUD regulation was saying. The windfall profits test was an attempt to determine if there were any properties that might be applying for incentives which they would not be entitled to because they were allowed to prepay. And Mr. Smith's approach, I think, is elegant and breathtakingly simple. If it was a test that was intended to be used to sort those properties that should not receive incentives because they could prepay, it could, the same methodological structures, the same inquiries, could be applied to determine those properties which could not prepay. And as I said, I think the judge looked at those tests in great detail. He did accept Mr. Smith's testimony, his expertise. He accepted his bona fides as an expert. And I think under the circumstances of his analysis, both test one and test two are fine. The government indicated that it argued that it had brought forth declaration of testimony from Mr. East and Mr. Berry. As the court indicated, the judge damaged, did not accept those opinions. And we objected to Mr. East's testimony because the government did not put Mr. East on the list of those people who were going to be, who had knowledge on this and that we didn't have an opportunity to propose him before his declaration was received. But if you look at the declaration, as the lower court found, its principles are, we think, essentially in a positive. There's a lot of discussion about what might have happened, what could have happened. If somebody, somewhere, sometime, at some point, had come forward with an application that allowed for prepayment. But in terms of understanding or attacking the evidence that was submitted for any of these specific appellants or any of the plaintiffs with respect to what we offered, those reports, those declarations don't get to it. I'm still having trouble with these fundamental issues. We're talking about taking the possibility that in due time, if it's agreed, that there is a taking that one looks at investment-backed expectations and all of the other bases on which compensation would be grounded. And yet the government says that not one of these plaintiffs' petitioners requested permission to prepay. How does one reconcile all of this? Well, because, Your Honor, if Congress wanted to allow our owners to prepay... But the regulations say that with permission. It isn't as if this is a surprise. It's in the mortgages, it's in the trust documents, and the regulations, enough of them, refer to authorization. The regulations that were in place, Your Honor, that we are tying, for example, in connection with the right to prepay, that argument, all say that you may prepay without HUD's consent. After 30 years, or in terms of under the mortgage terms. That's right, Your Honor. And what happened when Congress enacted this statute is it imposed these extraordinarily strict criteria to say that if you wanted to prepay, after the enactment of ELIPA and later with LIPRA, if you wanted to prepay, you had to satisfy these incredibly strict criteria. And you needed permission. And yet we're told that not one of these plaintiffs requested permission after those enactments. They did not, Your Honor, for the reasons that were stated in the declarations and the deposition testimony that we submitted in support of our motion for summary judgment. The owners, who, as I said, had owned the property in many instances for decades, knew the property, knew the market, and also knew what the regulations and the preservation statutes required. They came forward with it. We couldn't meet these standards. We were unable to do so because the standards required us to prove that which we could not prove. They required us to prove that there would be no adverse impact on the market if we were allowed to prepay our mortgage. And that's what we asked Mr. Smith to do. Could you come up with a test that would allow us to evaluate, allow the court in a methodologically sound and we think rigorous manner to come forward with evidence to demonstrate that you could not prepay. And for all of the plaintiffs, except for the handful whose claims we're looking at today on the rightfulness issues, for all but a handful, Mr. Smith concluded that those plaintiffs on the testimony test could not, in fact, satisfy the statutory requirements of prepayment. So that's why the owners didn't come forward to the agency, did not ask to prepay because they knew that in order to do so, the government would be required to essentially ignore the requirements in the statute. And indeed, that's what this court said in Cienega in 2001, that those statutes were extraordinarily strict and HUD had no discretion. It couldn't do anything if you couldn't satisfy those regulatory, I'm sorry, couldn't satisfy the threshold requirements that the statute imposed to allow an owner to prepay. It's not surprising that the owners reached this conclusion. There were thousands of properties in the United States that were covered by the Section 221 statute and Section 236. Only a handful of them, I think that our very diligent efforts have identified only seven properties in that whole portfolio that actually succeeded in prepayment and perhaps less than the score of properties even asked to do so. And why? The reason is that the owners knew that they were not going to be allowed to prepay. Again, because if Congress wanted to let people prepay, they could have just stood by and not enacted these statutes. But these statutes were enacted for a reason, and the reason was to prevent people from prepaying their mortgage. But if you're already subject to an agreement that prepayment is prohibited for 40 years, why would this make any difference to these owners? The owners, in most instances, with the limited exception of the handful of plaintiffs who are arguing about their right to prepay, their contract said that they could prepay in 20 years. Yes, well, looking at the exception. Yes, but I would also say, again, Your Honor, that if you look at the regulations at the time under which these notes were drafted, and remember that this court in Greenbrier made the point that the prepayment terms in these mortgage notes were derived from the HUD regulations. So this court has already tied the language of these notes to the regulations pursuant to which they were drafted, and that's not an unusual thing in programs that involve statutory programs that are implemented by an agency that have been carried out through the government and the private sector through various forms of contracts. The Greenbrier case has already concluded that the language with respect to prepayment that's in these notes derives from the statutes and the regulations. As applied to Greenbrier. Well, I think it was trying to make a general statement with respect to the relationship between the regulations that we've been talking about today and the notes that took effect. But certainly those people like the Biaforas and the other plaintiffs who have arguments with respect to the right to prepay understood at the time they entered in what the regulations allowed and read their notes to say if we stop receiving these rent supplements that we're then receiving, we wouldn't be allowed to prepay. And indeed, that's what happened to the Biaforas. In December of 1987, they asked HUD to allow them to prepay, because HUD had said to them, if you stop receiving the rent supplement contract and enter into the Section 8 program, among other things, you will be allowed to prepay. So in December of 1987, they wrote to HUD. And HUD wrote back in January of 1988 saying, we think the statute could be changing, but right now it is true that we do allow owners to prepay their mortgages. And by the way, here are the steps that you must follow if you want to prepay your mortgage. So HUD had the same understanding with respect to the Biaforas, that they were an early case because they had an early prepayment. But it's always true, though, is it not, that when you act in reliance on governmentally granted rights, whether it be by statute or regulation, you always act at risk because the government could change those statutes or regulations. Well, I think that the answer is, as I pointed out, that at the time they entered into the program, they knew what those regulations said, they knew what rights came along with those notes. And at every point up until this case, when the government raised this issue about the right to prepay, the government has consistently said that these notes, even if they don't specifically say that there's a right to prepay, the note has to be interpreted to allow for that. It's revisionist history at its worst. One last question, real quick. I just want to make sure my count is right. I have six properties where there was a prohibition against prepayment in the mortgage, and that's really the only properties you're talking about right now. The other 15 all, by my count, had a clause in the mortgage that expressly allowed the mortgage holder to prepay. Is that right? That's right. Now, I just want to make sure I have the numbers right. So you're talking only about the six properties that had the prohibition. And the 15 properties, the others, all expressly indicated you were allowed to prepay at 20 years. The way I'm going to say it is, yes, the other 15 properties tracked the regulation. These six properties didn't. I understand your point. Bear with me here. The only other point I'd make is that in his discussion this morning, the counsel for the government did indicate that, in fact, in the issue of preclusion question, that, in fact, this is a takings case. That's what he made the distinction. He said this is a takings case. The Fourth Circuit case was not. It was a due process challenge. And I think that's totally consistent with the position that we have taken, which is that the... to the extent that there is something specific that distinguishes any of these six selected cases from the others to make sure that we have it straight. Is there anything else that you think you need to add? No, Your Honor. Not with respect to the issues we have discussed already. There is some distinction between the, for example, in the terms of the declarations and deposition testimony that was submitted for those plaintiffs on issues such as ripeness and so forth. We think that that's all set out in detail in the briefs, and I wouldn't say anything other than the testimony supports, for these plaintiffs as much as it did for everyone else, the original conclusion that Judge Danich made, which was that that testimony was not conclusory in nature. It was fact-based. We would say that whether you look at it as fact testimony or as lay opinion testimony in either case, it's admissible, and it supports our conclusion that those owners did present evidence which, as Judge Danich originally said, made a... Okay, so you rely on the briefs for those distinctions? Yes, we do. And is that all right with you, Mr. Harrington? Your Honor, we think that the briefs do talk about the distinctions from cases, from property to property, from plaintiff to plaintiff. Okay. Well, thank you. Is there anything else you need to tell us? I think there's one final argument, Your Honor, that was made by the government in connection with a handful of properties, the Dolly Ann property, the Carriage House and Muskegon property, and the Carriage House South property. The allegation by the government was whether a LIPA affected the regulatory taking because it expired before these properties could exercise their prepayment right. And, again, this is an issue that was only raised in opposition, not by cross-appeal. And they didn't address it at all? And they haven't addressed it here today at all? They have not addressed it. If the Court is satisfied with the argument, I'll just say that we would disagree with that. Okay. Thank you. Thank you, Counsel. Case well presented.